Filed 12/14/22 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER ALEXANDER VELEZ,<br><br>    Defendant and Appellant. | F081839<br><br>(Super. Ct. No. DF013807D)<br><br>**ORDER MODIFYING OPINION**<br><br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the partially published opinion filed herein on December 2, 2022, be modified in the following particulars:

1. On page 3, the first full paragraph beginning with "Christopher makes the following contentions" is deleted and the following paragraph is inserted in its place:

   "Christopher makes the following contentions on appeal:  (1) the trial court erroneously denied his motion to bifurcate the gang charges and the gang enhancement allegations; (2) the prosecution's expert witness improperly opined that he intended for the victim to be shot; (3) the evidence did not support his misdemeanor unlawful driving or taking of a vehicle without the owner's consent conviction; (4) section 1109 applies retroactively and requires all convictions and enhancements be reversed; (5) amended section 186.22 applies retroactively and requires all gang-related convictions and enhancements be reversed; (6) the court failed to instruct the jury on the elements of carrying a loaded firearm in public as an active participant in a criminal street gang; (7) he was improperly convicted of both

carrying a loaded firearm in public as an active participant in a criminal street gang and the necessarily included offense of active participation in a criminal street gang; (8) the court imposed an unauthorized sentence on count 1; (9) *Bruen* rendered unconstitutional California's licensing scheme (§ 26150 et seq.) and—by extension—section 25850, which criminalizes carrying a loaded firearm in public; and (10) the cumulative effect of the aforementioned errors deprived him of due process."

There is no change in the judgment.


                                                                DETJEN, J.


WE CONCUR:


POOCHIGIAN, Acting P. J.


DE SANTOS, J.

Filed 12/2/22 (unmodified opinion)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER ALEXANDER VELEZ,<br><br>    Defendant and Appellant. | F081839<br><br>(Super. Ct. No. DF013807D)<br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

        Scott N. Cameron, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

        * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., III., IV., V., and VII. of the Discussion.

# INTRODUCTION

Defendant and appellant Christopher Alexander Velez (Christopher)[1] and codefendants Alejandro Alvarado (Alejandro) and Gerardo Alvarado (Gerardo)[2] were each charged with attempted murder (Pen. Code,[3] §§ 187, subd. (a), 664 [count 1]); carrying a loaded firearm in public as an active participant in a criminal street gang (§ 25850, subd. (c)(3) [count 2]); active participation in a criminal street gang (§ 186.22, subd. (a) [count 3]); and misdemeanor unlawful driving or taking of a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a) [count 5]).  As to count 1, the information alleged in part that the attempted murder was willful, deliberate, and premeditated (§ 189); Christopher committed the offense for the benefit of, at the direction of, and/or in association with a criminal street gang (§ 186.22, former subd. (b)(1)); and at least one principal in the attempted murder personally and intentionally discharged a firearm and caused great bodily injury (§ 12022.53, subds. (d), (e)(1)).

Following trial, the jury found Christopher guilty as charged and found true the special allegations.  The trial court imposed 15 years to life "with a minimum parole eligibility date of 7 years" plus 10 years for vicarious "use of the firearm"[4] on count 1 and a concurrent one year on count 5.  The court stayed execution of punishment on counts 2 and 3 pursuant to section 654.

While this case was pending, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), which amended section 186.22 and

---

[1] To avoid confusion, we identify individuals who share the same surname by their given name.

[2] Alejandro (case No. F081842) and Gerardo (case No. F082048) each filed a separate appeal.

[3] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[4] Exercising its discretion, the court struck the vicarious firearm discharge enhancement.

added section 1109 (Stats. 2021, ch. 699, §§ 3, 5).  The new laws became effective on January 1, 2022.  (See Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)  In addition, on June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. ___ [142 S.Ct. 2111] (*Bruen*), which held that New York's "proper cause" requirement for an unrestricted license to carry a handgun outside the home impermissibly infringed on the right of law-abiding citizens to bear arms in public for self-defense.

Christopher makes the following contentions on appeal:  (1) the trial court erroneously denied his motion to bifurcate the gang charges and the gang enhancement allegations; (2) the prosecution's expert witness improperly opined that he intended for the victim to be shot; (3) the evidence did not support his misdemeanor unlawful driving or taking of a vehicle without the owner's consent conviction; (4) section 1109 applies retroactively and requires all convictions and enhancements be reversed; (5) amended section 186.22 applies retroactively and requires all gang-related convictions and enhancements be reversed; (6) the court failed to instruct the jury on the elements of carrying a loaded firearm in public as an active participant in a criminal street gang; (7) he was improperly convicted of both carrying a loaded firearm in public as an active participant in a criminal street gang and the necessarily included offense of active participation in a criminal street gang; (8) the court imposed an unauthorized sentence on count 1; (9) *Bruen* rendered unconstitutional California's licensing scheme (§ 26150 et seq.) and—by extension—section 25850, which criminalizes possession of a firearm without a license; and (10) the cumulative effect of the aforementioned errors deprived him of due process.

In the published portion of this opinion, we reject Christopher's assertion that California's licensing scheme and section 25850 are unconstitutional.

In the unpublished portion of this opinion, we conclude the trial court did not abuse its discretion when it denied Christopher's bifurcation motion; assuming arguendo

3.

that the gang expert expressed an improper opinion, such an error was not prejudicial; substantial evidence supported the misdemeanor conviction on count 5; and, even if we assume arguendo that section 1109 is retroactive, reversal is unwarranted. Additionally, we accept the Attorney General's concessions that: Christopher's gang-related convictions on counts 2 and 3 as well as the gang enhancement on count 1 must be reversed in view of amended section 186.22; the court failed to instruct the jury on the elements of carrying a loaded firearm in public as an active participant in a criminal street gang; Christopher was improperly convicted of both carrying a loaded firearm in public as an active gang participant and the necessarily included offense of active participation in a criminal street gang; and the court imposed an unauthorized sentence on count 1. Finally, we conclude there was no cumulative error.

## STATEMENT OF FACTS

### I.     Testimony of Antonio H.[5]

a. *Gang affiliation and relationships*

When he was 15 years of age, Antonio—also known as "Clever"—was initiated into Delano Norte, a Norteño street gang that claims Delano as its territory. As a Norteño, he identified with the color red, the letter N, and the number 14. Antonio subsequently joined 21st Street, a Delano Norte subset, with the backing of his best friend and fellow gang member Oswaldo "Little Baby Boy" Guzman.

21st Street is organized into a three-tiered hierarchy comprised of "soldiers," "squad leader[s]," and the "channel." A soldier receives orders and "do[es] whatever need[s] to be done." A squad leader "run[s] [his] own squad" of soldiers. The channel— "the main one from the hood"—oversees the subset, relays information to squad leaders from "[w]hoever is running the town," collects "[t]axes," and determines how a member who "mess[es] up" should be punished. Antonio began as a soldier in 2014, was elevated

---

[5] In exchange for his testimony, Antonio was granted use immunity.

to squad leader at some point, and became the channel in early 2018. However, in or around June 2018, he was demoted to squad leader without any explanation. While Antonio was a member of 21st Street, Ivan "Evil" Rodriguez was the Norteño "running the town" and "in charge of" "everything that goes on" in Delano. Rodriguez received correspondences "[f]rom homies in jail" in the form of "kite[s]," i.e., "long and narrow" "rolled up" "piece[s] of paper" with "small writing."

By "putting in work" for the gang, i.e., by participating in shootings, robberies, and drug sales, Antonio earned many Norteño-related tattoos, including "21st Street" on his face and left arm; "1" and "4" on his biceps; "NKC" and four dots on his left arm; one dot on his right hand and four dots on his left hand; two horizontal lines underneath four dots (the Mayan numeral for 14) on his left ring finger; "Delano" on his chest; "KC" on his stomach; and "banging" above the kneecap. He also had "LB Boy"—Guzman's moniker—on his arm.

Antonio met Alejandro, also known as "Peanut," through 21st Street. The latter became a member of the subset "[s]omewhere between 2017 and 2018" by "putting in work," i.e., by "go[ing] after [the gang's] enemies" and "shoot[ing] somebody." Alejandro served as the "bank," the soldier who "hold[s] the money" amassed by 21st Street. He had gang-related tattoos such as "Norte[ñ]o" and "Delano Norte." Antonio considered Alejandro a friend and hung out with him "[m]ostly every day" around September 2018.

Antonio also met Alejandro's brother Gerardo, also known as "Little Knocker," through 21st Street. The latter became a member of the subset before the former and had gang-related tattoos such as "Norteño" and "Delano Norte." Antonio and Gerardo hung out "maybe once, twice a week" around the time of September 2018.

Antonio met Christopher, also known as "Baby Sisco," through Jose "Little Sisco" Velez (Jose), the latter's older brother and 21st Street's channel. Prior to September

5.

2018, Christopher was an associate of the subset and did not have any gang-related tattoos.

    b. *The shooting*

On the night of September 9, 2018, Antonio, Alejandro, and Christopher attended a party at another gang member's house. Sometime later, Guzman arrived in his black sedan to pick up Alejandro and Christopher. Antonio noticed that Gerardo and Jose were also in Guzman's car and "thought it was weird" that the five "just left" and "didn't say nothing" to him. At or around midnight, Antonio returned to his home in Delano. At approximately 2:00 a.m., Alejandro and Christopher visited him and asked for a ride to Richgrove "[t]o see some girls." Although Antonio initially refused, he relented when Alejandro and Christopher indicated that they "were just going to walk."

Roughly five minutes after Antonio started driving, Alejandro said, "Oh, I need to throw up." Christopher added, "[Y]eah, me, too." Antonio pulled his 2011 Honda Accord over near some fields and the two passengers exited the vehicle. He heard "overexaggerat[ed]" "gagging noises" and "knew they weren't throwing up." Antonio then saw Guzman's sedan passing by and "started flashing [the Accord's] lights," but the sedan "just kept going." After Alejandro and Christopher returned, Antonio told them about what had happened, but the pair ignored him. The trip resumed.

Eventually, Christopher instructed Antonio to turn onto a dirt road surrounded by grapevines. Alejandro and Christopher then claimed that "they needed to throw up again." Antonio parked and all three men exited the vehicle. While Alejandro and Christopher were pretending to vomit in the grapevines, Antonio used the Snapchat application on his cell phone to film a video.[6] He sat down in the driver's seat and was about to upload the recording when he was shot from behind. Antonio "immediately

        [6] The record indicates that Antonio filmed the video at 3:00 a.m. on September 10, 2018. The jury watched this footage.

6.

grab[bed] [his] face" and observed "all the blood." He "thought it was an accident" and told Alejandro and Christopher, "Get back in the car. Let's go to the hospital. You just shot me." Neither man responded.

Antonio turned around and saw Alejandro and Christopher standing outside the Accord. Alejandro was pointing a .22-caliber semiautomatic firearm at "arm's length" while Christopher was "shaking." Alejandro pulled the trigger, but the gun jammed and did not fire. Antonio recognized that the weapon was a malfunctioning "hood gun" shared amongst 21st Street members that no longer ejected a spent casing and required the user to manually remove said casing so that another live round can be fired. As Alejandro was attempting to reload the gun, Antonio got out of the car and cried, "What are you doing? What the fuck are you doing[?]" Antonio then spotted Guzman's sedan approaching "with [the] lights off" and realized that "they set [him] up."

Antonio ran into the grapevines for cover. He saw Gerardo exit Guzman's sedan and talk to Alejandro. At one point, Gerardo told Alejandro, "Give me the gun, give me the gun." While the two bickered, Antonio headed back to the Accord to retrieve his cell phone. Gerardo, who had taken possession of the hood gun, noticed Antonio and tried to shoot him, but the firearm jammed again. Antonio fled the scene. He reached Richgrove and started knocking on doors. One resident finally responded and called 911.[7] Antonio was transported to a hospital, where he was treated for at least five hours.

c. *The aftermath*

A day or two after the shooting, Jose got ahold of Antonio by calling the latter's nephew's cell phone and accused him of being an informant.[8] Antonio was aware that "snitching," i.e., "tell[ing] on somebody" to law enforcement, is prohibited by 21st Street

---

[7] The jury listened to a recording of the 911 call.

[8] Antonio used another cell phone to video record the conversation. The jury watched and listened to this recording.

7.

and punishable by death. A snitch is ascertained through "paperwork" such as "police reports" and "papers from court." Antonio recalled that—prior to the shooting—he had been questioned by a police officer about a stolen vehicle parked in front of his place and granted access to his surveillance camera footage when advised that law enforcement was "going to take it regardless." Thereafter, Rafael "Rafa" Valdez (Rafael), a member of Delano Norte, was arrested and charged with possession of a stolen vehicle. Antonio believed that the conversation with Jose confirmed that "they were going to kill [him]." As 21st Street's channel, Jose would have received the order to kill from Rodriguez and assigned the task to other people.

Antonio contacted the Kern County Sheriff's Office. He provided Alejandro's phone number ending in -08 as well as photographs of Alejandro, Gerardo, Christopher, and Guzman. Antonio left the gang and moved out of Kern County. He was afraid to return to Delano. At some point, Antonio learned that his Accord had been incinerated. At trial, he testified that he did not give anyone permission to drive or take his vehicle.

## II.     Testimony of law enforcement personnel

### a. *Events preceding the shooting*

On May 4, 2018, Officer Rivera of the Delano Police Department encountered Rafael wearing a red shirt and sitting in a vehicle that had been reported stolen. After apprehending Rafael, Rivera went to a nearby residence and knocked on the door. Antonio answered. Rivera asked Antonio "if he had anything to do with the vehicle that was outside." Antonio replied that Rafael "had arrived at his house and offered him some tires to buy," but he told him to leave. Antonio later provided surveillance camera footage. Rafael was subsequently convicted of possession of a stolen vehicle.[9]

---

[9] The prosecution presented Rafael's conviction as one of six predicate gang offenses.

On June 20, 2018, Kern County Probation Department Supervisor Baameur conducted a search at the residence of Ivan Gutierrez Rodriguez, also known as "Little Evil." He found a "kite," i.e., a small note written by an inmate and "smuggled out" "to communicate with individuals that are outside of the facilit[y]." It read:

> "I send mine in regards to Antonio H[.] aka Clever D/Delano 21st. He stated that Rafa D/Delano was trying to sell him tires . . . and he told him to leave. This is all I remember. [¶] . . . Antonio H[.], Clever 21st, Delano/Kern County now I exit."

The kite was addressed to "La Casa," labeled as an "IR," and signed by Ezekiel "Tone" Burciaga, a member of Delano Norte's Varrio Delano Locos (VDL) subset.

b. *The day of the shooting*

On September 10, 2018, at 4:26 a.m., Deputy Cordova of the Kern County Sheriff's Office arrived at the hospital and met Antonio in the emergency room. Cordova photographed "a visible gunshot wound to [Antonio's] top lip." The two discussed the shooting.

At approximately 7:45 a.m., Officer Aguirre of the California Highway Patrol was dispatched to a rural area roughly 10 miles north of Delano, where he found Antonio's "smoldering" Accord.

c. *Arrests*

On October 7, 2018, Officer Santaella of the Delano Police Department assisted with a traffic stop of a vehicle occupied by Alejandro and Gerardo, among others. Both were wearing red clothing. Alejandro and Gerardo were arrested on outstanding warrants.

On October 9, 2018, Deputy Lovan of the Kern County Sheriff's Office arrested Christopher at a residence. Guzman was present at the scene.

9.

d. *Cell phone location data*

Sergeant Colbert of the Kern County Sheriff's Office analyzed the location data of the phone number ending in -08 on September 10, 2018, between 2:00 a.m. and 4:30 a.m. At trial, he presented his findings in a slideshow presentation.

i. Phone calls

At 2:05 a.m., the phone made an outgoing call that connected to a cell tower in Delano facing west. At 2:39 a.m., the phone received an incoming call that connected to a tower in northern Delano. At 3:07 a.m., the phone made an outgoing call that connected to the northern Delano tower. At 3:17 a.m., the phone received an incoming call that connected to a tower in southern Earlimart. At 3:21 a.m. and 3:23 a.m., the phone made outgoing calls that connected to the southern Earlimart tower. At 3:23 a.m., 3:26 a.m., and 3:29 a.m., the phone made outgoing calls that connected to a tower in Alpaugh. At 3:29 a.m., the phone received an incoming call that connected to the Alpaugh tower. At 3:38 a.m., the phone received an incoming call that connected to the southern Earlimart tower. At 3:39 a.m. and 3:40 a.m., the phone made outgoing calls that connected to the southern Earlimart tower. At 3:44 a.m., 3:45 a.m., and 3:46 a.m., the phone received incoming calls that connected to the southern Earlimart tower. At 4:29 a.m. and 4:30 a.m., the phone made outgoing calls that connected to the westward facing tower in Delano.

ii. Internet usage

At 3:02 a.m., the phone accessed the Internet and connected to a cell tower east of the site of the shooting. Between 3:03 a.m. and 3:54 a.m., the phone accessed the Internet multiple times and connected to a tower in northern Pixley. At 3:54 a.m., the phone accessed the Internet and connected to the westward facing tower in Delano.

e. *Additional predicate gang offenses*

On April 15, 2015, Officer Bursiaga of the Delano Police Department pursued Kristofer Hernandez on foot through an alleyway. At some point, Bursiaga heard a loud

10.

noise emanating from a Dumpster in Hernandez's proximity. After Hernandez was detained, Bursiaga returned to the Dumpster, where he found a .22-caliber revolver. Based on prior encounters with Hernandez and various Norteños, conversations with other officers, and past training, Bursiaga opined that Hernandez was a Norteño. Hernandez subsequently pled nolo contendere to carrying a loaded firearm in public as an active participant in a criminal street gang.

On November 21, 2016, Officer Bautista of the Delano Police Department assisted with a traffic stop of a vehicle occupied by Alejandro, Gerardo, Jesse Orozco, and Edgardo Rosales. A .22-caliber semiautomatic pistol was found inside. In prior conversations, Orozco informed Bautista that he was a Norteño. Both Gerardo and Orozco subsequently pled nolo contendere to active participation in a criminal street gang and carrying a loaded firearm in public as a nonregistered owner. Rosales subsequently pled nolo contendere to active participation in a criminal street gang.

On August 27, 2017, Officer Bautista pulled over a vehicle to conduct a traffic stop. When that vehicle stopped, Omar Valdez (Omar)—the front passenger—got out, discarded a semiautomatic pistol, and unsuccessfully attempted to flee. Omar sported numerous Norteño-related tattoos. The driver, Damian Cardenas, was an admitted Norteño. T-shirts bearing images of deceased gang members, San Francisco 49ers jerseys, Chicago Bulls caps, and a red handkerchief were found inside the vehicle. Omar subsequently pled nolo contendere to possession of a firearm by a convicted felon.

On February 20, 2018, Officer Galutira of the Delano Police Department pursued a vehicle occupied by Burciaga, among others. The vehicle eventually stopped and a red bandana was found inside. Burciaga subsequently pled nolo contendere to unlawful driving or taking of a vehicle without the owner's consent, evading a pursuing peace officer, and active participation in a criminal street gang.

On July 22, 2018, Officer Santaella observed Antonio Montemayor arriving in a car and wearing red shorts outside the residence of Brandon Santana, an admitted

Norteño. In the back seat, Santaella saw a nine-millimeter handgun. He entered the residence and came across Montemayor, Santana, Cardenas, and Andrew Lomeli, among others. Santaella opined that each of these individuals was a Norteño. Montemayor subsequently pled nolo contendere to possession of a firearm by a convicted felon.

f. *Other gang encounters*

On June 23, 2015, Officer Strand of the Delano Police Department contacted Jose and Guzman. Jose had tattoos of "DN" and "KC" on his chest; "SF 49ers" on his right arm; "DN" on his hands; and four dots on his wrist. Guzman had tattoos of "KC" on his left arm; "D" and "NKC" on his right arm; "21st" and "2-1" on his right elbow; one dot on one elbow and four dots on the other elbow; "1-661" on his right wrist; and four dots on his fingers.

On May 21, 2016, Officer Alvarez of the Delano Police Department pulled over a vehicle occupied by Gerardo and Jose Luis Torres, among others. Torres had a tattoo of four dots on his left elbow.

On May 25, 2016, Officer Santaella encountered Gerardo, Omar, and Julian Valenzuela. He opined that Omar and Valenzuela were Norteños based on previous conversations and their tattoos. Santaella arrested all three men for violating a court order restricting associations with other gang members.

On November 8, 2016, Officer Santaella conducted a traffic stop of a vehicle occupied by Gerardo and Lomeli. He opined that Lomeli was a Norteño based on prior conversations and his tattoos, which included "DN," "Delano," and "14." Santaella arrested Gerardo for violating juvenile probation terms prohibiting associations with other gang members.

On November 11, 2016, Officer Santaella contacted Guzman and Francisco Arreola. Guzman, who wore a red belt, acknowledged that he was a Norteño and a member of 21st Street. In addition to the tattoos previously documented, he had a tattoo

12.

of Antonio's moniker "Clever." Santaella opined that Arreola was a Norteño based on prior conversations.

On January 7, 2018, Officer Murguia of the Delano Police Department came across Alejandro, who was wearing a red-striped shirt.

On July 8, 2018, Officer Murguia conducted a traffic stop of a vehicle occupied by Antonio, Christopher, and Guzman.

g. *Expert testimony*

Deputy Geherty of the Kern County Sheriff's Office was the prosecution's gang expert. At the time of trial, he was assigned to the High-Intensity Drug Trafficking Areas unit, which specialized in "violent fugitive apprehension," "undercover operations," and "gang investigation[s]." At the time of the shooting, Geherty was a member of the Gang Suppression Unit. In that capacity, he conducted "numerous investigations in regard to both Norte[ñ]os and Sure[ñ]os" and communicated with gang members on a regular basis. Geherty also attended various seminars on gangs and gang culture and became a certified instructor on those subjects.

i. Background on Nuestra Familia and the Norteños

Geherty testified that Nuestra Familia is a prison gang that exerts control over "northern Hispanics" "not just inside the prison system but outside as well." Norteños are the "foot soldiers" "outside of the prison system" whose activities are governed by the "14 Bonds." Geherty detailed:

> "Ranging from they touch on education and not in the fact of how we are educated, getting good grades in math or something like that. They educate themselves on their movement. They further themselves in the education on the Norte[ñ]os movement, on their beliefs and their upbringing as well as their history and their past, their people, so to say.
>
> "So they touch on education. They touch on treason. No treason. No cowardness. You cannot be a coward and be a Norte[ñ]o. Treason ranging from snitching to going and siding with the enemy, which includes law enforcement. From there they touch on no red-on-red violence, which

13.

is no Norte[ñ]o should lay hands on another Norte[ñ]o unless it's sanctioned. A violation of that rule could get the violator assaulted as well."

The penalty for snitching is "pretty much death."

Norteños "associate themselves with red" and the letter N, which stands for "Nuestra Familia" and/or "Norteños." Because "the 14th letter of the alphabet" is N, they identify with the number 14. Norteños are "forever rivals" with Sureños, also known as the "southern gang," who "align themselves with [the prison gang] La eMe or Mexican Mafia" and "associate themselves with blue," the letter M, and the number 13. Norteños refer to Sureños as "Scrap[s]" and often wear San Francisco 49ers apparel to display the initials "SF," which means "Scrap Free."

Norteño kites "can come from any active Norte[ñ]o member" "from all different places," including prisons and detention facilities, and "can cover a list of things." Geherty specified:

> "They often have monthly checks as to what is happening within the prison system, within jail settings[,] out on the streets, who has been put on freeze, who has been ordered to do cleanup, who has paperwork on them."

Geherty reviewed the kite addressed to "La Casa," labeled as an "IR," and signed by Burciaga. He explained that (1) "La Casa" referred to "the head of the house or the house representative, at the time, wherever [the author's] being kept, in what facility [he's] in"; and (2) "IR" meant "incident report," which "document[s] events that have occurred that have violated rules or committed a crime against the gang and it's documenting exactly what transpired."

### ii. Background on Delano Norte

Geherty testified that Delano Norte is a street gang that "falls within the Norte[ñ]o structure" and claims "Delano as a whole" as its territory. The gang's primary activities include homicides, robberies, illegal weapons possessions, narcotics sales, and automobile theft. Common gang symbols include the letters "DN" for "Delano Norte,"

14.

"D" for "Delano," "KC" for "Kern County," and "NKC" for "North Kern County" and the number 14, which can be expressed in different Arabic, Roman, or Mayan numerals.

Delano Norte is composed of various subsets, including 21st Street and VDL. Per the 14 Bonds, subsets cooperate with one another.

### iii. Opinion on gang affiliation

#### 1. Perpetrators of the predicate gang offenses

Geherty opined that Hernandez was an active member of Delano Norte on April 15, 2015, based on Hernandez's plea of nolo contendere to carrying a loaded firearm in public as an active participant in a criminal street gang.

Geherty opined that Orozco was an active member of Delano Norte on November 21, 2016, based on (1) Geherty's earlier investigations involving Orozco; (2) Orozco's gang-related tattoos; and (3) Orozco's plea of nolo contendere to unlawful possession of a firearm—one of Delano Norte's primary activities—as well as active participation in a criminal street gang.

Geherty opined that Rosales was an active member of Delano Norte on November 21, 2016, based on (1) conversations with Rosales; and (2) Rosales's plea of nolo contendere to active participation in a criminal street gang.

Geherty opined that Omar was an active member of Delano Norte on August 27, 2017, based on (1) prior contacts with Omar; (2) Omar's gang-related tattoos; and (3) Omar's plea of nolo contendere to unlawful possession of a firearm, one of Delano Norte's primary activities. Geherty pointed out that Omar made a "21" hand sign in a photograph uploaded to Facebook.

Geherty opined that Burciaga was an active member of Delano Norte on February 20, 2018, based on (1) prior contacts with Burciaga; (2) the red bandana found in the car that Burciaga occupied on the aforementioned date; (3) Burciaga's plea of nolo contendere to active participation in a criminal street gang; and (4) Burciaga's signature on the Norteño kite detailing the May 4, 2018 incident that led to Rafael's arrest.

15.

Geherty opined that Rafael was an active member of Delano Norte on May 4, 2018, based on (1) Rafael's red shirt on the aforementioned date; (2) Rafael's conviction for possession of a stolen vehicle, one of Delano Norte's primary activities; (3) Antonio's testimony regarding Rafael's gang membership; (4) Rafael's moniker "Rafa"; and (5) Rafael's identification in the Norteño kite signed by Burciaga.

Geherty opined that Montemayor was an active member of Delano Norte on July 22, 2018, based on (1) prior contacts with Montemayor; (2) Officer Santaella's testimony that Montemayor was in the company of other Norteños; and (3) Montemayor's plea of nolo contendere to unlawful possession of a firearm, one of Delano Norte's primary activities.

## 2. Christopher and codefendants

Geherty opined that Alejandro was an active member of Delano Norte on September 10, 2018. Alejandro had numerous gang-related tattoos, including (1) "1-661"—a local area code consisting of numbers that add up to 14—on his stomach; (2) "1" on the right bicep and "4" on the left bicep; (3) one dot on his right elbow; (4) "21st Street" and four dots on his left arm; (5) four dots on his left hand; (6) "KC" on the right shin; and (7) a "brand new," "still scabbing" Mayan "14" on the left ring finger. In prior encounters with law enforcement, Alejandro wore red apparel and was in the company of other Norteños. At the time of the September 10, 2018 shooting, he and other gang members worked together. At the time of his arrest, Alejandro was dressed in red clothing.

Geherty opined that Gerardo was an active member of Delano Norte on September 10, 2018. Gerardo had numerous gang-related tattoos, including (1) "21st" and "KC" on his chest; (2) "Delano" on his stomach; (3) "D" on his right shoulder; (4) one dot on his right hand and four dots on his left hand; (5) "Peanut"—Alejandro's moniker—on his left hand; (6) "NKC" and "always active" on his fingers; (7) "LB Boy"—Guzman's moniker—on his right arm; (8) "1-661" on his right shin; (9) a Mayan

16.

"14" on his left hand; and (10) "Norte[ñ]o" and a "huelga bird"[10] on his back, both of which were unfinished. In prior encounters with law enforcement, Gerardo was in the company of other Norteños. Following the November 21, 2016 traffic stop, he pled nolo contendere to active participation in a criminal street gang and carrying a loaded firearm in public as a nonregistered owner. At the time of the September 10, 2018 shooting, Gerardo and other gang members worked together. At the time of his arrest, he was dressed in red clothing. Geherty pointed out that Gerardo made various hand signs, including "N," "4," and "21," in photographs uploaded to Facebook.

Geherty opined that Christopher actively participated in the Delano Norte gang on September 10, 2018. A few months before the shooting, Christopher was seen in the company of gang members. At the time of the shooting, he cooperated with gang members. Although Antonio testified that Christopher was not a gang member at the time of the shooting, Geherty remarked that a gang associate "who hasn't officially been put into the gang" can still "assist with committing crimes with full-fledged members," which would help the associate become a member. He added:

> "[Gang members are] not going to bring somebody who is not associated or trying to put themselves on with the gang because it opens them up to snitching. Somebody who is not about that life has more chances to snitch, as well as assist in the operation of the incident, that being the shooting."

In a photograph uploaded to Facebook on September 12, 2018, Christopher and his brother Jose made "21st" hand signs. Geherty pointed out that Christopher made a "4" hand sign in a different Facebook photograph. At the time of his arrest, Christopher was in the company of a gang member. While Christopher did not have any tattoos prior to the shooting, he apparently "earned the right to put [gang-related tattoos] on his body" thereafter. At the time of trial, his tattoos included (1) the emblem of the San Francisco

---

[10] Geherty testified that Norteños "often align themselves with the huelga bird" because Sureños refer to "subjects who did not align with them as farmers" and the bird is associated with the United Farm Workers labor union.

49ers on his chest; (2) "21st" on his biceps; (3) a clock with the hands "broken at the 1 and the 4" on his right forearm; and (4) "Dela" and the Mayan "14" on his right shin. Geherty, who was familiar with Christopher's family, explained the significance of his gang moniker:

> "Christopher Velez's brother, Jose Velez, is Little Sisco. And his father . . . goes by Sisco. [¶] . . . [¶]

> ". . . It signifies kind of a structure. So you have the high or big homie, who has the moniker, then the little homie has a 'little' in front of the moniker. They take on the big homie name as a sign of respect as well as like a third would be a 'baby,' Baby Sisco."

### 3. Other persons of interest

Geherty opined that Jose was an active member of Delano Norte on September 10, 2018, based on (1) Jose's gang-related tattoos; (2) Antonio's testimony that Jose was 21st Street's channel; and (3) the September 2018 phone conversation between Jose and Antonio, in which the latter accused the former of being a snitch. As mentioned, in a Facebook photograph, Jose and his brother Christopher made "21st" hand signs.

Geherty opined that Guzman was an active member of Delano Norte on September 10, 2018, based on (1) Guzman's gang-related tattoos; (2) Officer Santaella's testimony that Guzman admitted being a Norteño; and (3) Guzman's participation in the September 10, 2018 shooting. Geherty pointed out that Guzman wore gang-related apparel, including a San Francisco 49ers jacket and red clothing, in photographs uploaded to Facebook.

### iv. Opinion on whether Alejandro and codefendants committed the September 10, 2018 shooting for the benefit of, at the direction of, and/or in association with Delano Norte

The prosecutor asked Geherty the following hypothetical question:

> "You have two active Delano Norte members and an associate driving around in a rural area outside of Delano in the middle of the

18.

night/early in the morning; that vehicle is being followed by a separate vehicle with at least one other active Delano Norte member.

"The driver of the first car is told to turn down a dirt road, then told to stop so that two passengers can vomit. When this happens, one of those passengers shoots the driver, an active member, in the head causing significant injury. The gun that is used to shoot the driver jams.

"While the driver is trying to get away, the third active member in the second car arrives that was following the victim. That active member demanded the gun and tries to clear the jam and shoots at the victim. However, the gun is still jammed. The driver successfully flees on foot.

"Do you have an opinion as to whether the crimes in this hypothetical were committed for the benefit of, at the direction of, or in association with the Delano Norte criminal street gang?"

Geherty opined that the crimes "were committed for the benefit of and in association with Delano Norte criminal street gang." He explained:

"This is a classic-case hypothetical that is eliminating somebody who is not conforming to the rules of the Delano Norte criminal street gang. That active member has violated one of their rules and is now dealing with the consequences of it.

"This benefits the Delano Norte criminal street gang entirely because it instills fear within their own ranking structure, that if you violate one of our rules, you are killed. And, therefore, they get compliance from all other active Delano Norte criminal street gang members.

"It furthers their movement. If they have unity, they have a more solid movement. That way it benefits the Delano Norte criminal street gang. [¶] . . . [¶]

". . . It doesn't just benefit the criminal street gang in and of itself but it also benefits all who were involved in it because they are now earning that respect and status within the gang to move up the ranks.

"They're showing that they're able to commit heinous offenses for the benefit of that gang to further their movement, so that individual gang members or associates, for that matter, are now making their way through the ranks. The higher they rise, the more power they get, the more influence they get.

". . . [Y]ou have two active members acting in, as well as an associate, acting all together to conduct this shooting which greatly benefits the chances of success in the incident in the shooting.

"And so you have two active members who are all associating, as well as an associate, all associating with each other to complete this shooting and to complete it successfully. [¶] . . . [¶]

". . . Even though . . . [some] members or associates didn't fire the firearm, in the hypothetical it says that they were actively assisting in the commission of the crime by asking to pull over and puke and that is setting up the shooting.

"So they're all acting in association inside that crime to get the completion of the crime done successfully, which ultimately benefits every single one of them. Just being there and helping out with the crime benefits that associate as well."

## DISCUSSION

**I.     The trial court did not abuse its discretion when it denied Christopher's bifurcation motion.**[*]

a. *Background*

Christopher's attorney filed a pretrial motion to bifurcate "[t]he gang sentencing enhancements and substantive gang counts (counts 2 and 3)" arguing that "[i]n a unitary trial, the jury will be presented with highly inflammatory evidence of 'predicate offenses' allegedly committed by members of Delano Norteño gangs, which are completely independent of any action by [Christopher]." At the motion hearing, the prosecutor countered:

"Your Honor, the People would object to any bifurcation. This case is a true gang case where the motive for the shooting is gang related, the relationship between the victim and the defendants is gang related, and that the entire case has evolved [*sic*] . . . the relationship between the gang and the defendants and the victim and there would be no way to really bifurcate those issues."

The trial court denied the motion.

---

[*] See footnote, *ante*, page 1.

Prior to closing arguments, the court instructed the jury in part:

> "[CALCRIM No. 1403 (Limited Purpose of Evidence of Gang Activity):]  You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged or that the defendant had a motive to commit the crimes charged.  You may also consider the evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied upon by an expert witness in reaching his or her opinion.

> "You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

b. *Analysis*

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."  (§ 1044.)  Pursuant to section 1044, a trial court possesses "[g]eneral authority to bifurcate trial issues" (*People v. Calderon* (1994) 9 Cal.4th 69, 74), including gang enhancement allegations (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*)).

"[T]he trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged."  (*Hernandez, supra*, 33 Cal.4th at p. 1050.)  "In the context of severing charged offenses, . . . 'additional factors favor joinder.  Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.'  [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.  [Citations.]  When the

21.

offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Citation.]" (*Ibid.*; see *ibid.* ["The analogy between bifurcation and severance is not perfect. . . . But much of what we have said about severance is relevant . . . ."].) Hence, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself . . . a court may still deny bifurcation." (*Ibid.*)

"We review the trial court's denial of the motion to bifurcate for abuse of discretion, based on the record as it stood at the time of the ruling." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952 (*Franklin*).) "Our review is guided by the familiar principle that '[a] court abuses its discretion when its rulings fall "outside the bounds of reason." ' [Citations.]" (*Ibid.*; see *People v. Turner* (2020) 10 Cal.5th 786, 807 [" ' "If right upon any theory of the law applicable to the case, [a ruling or decision] must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' "].) "If the trial court's ruling was correct on the record before it, the ruling is subject to reversal only upon a showing that ' "joinder actually resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" (*Franklin, supra,* at pp. 952-953.)

The California Supreme Court has held that—in cases not involving the gang enhancement—"evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*Hernandez, supra,* 33 Cal.4th at p. 1049.)

However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*; accord, *Franklin*, *supra*, 248 Cal.App.4th at p. 953; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 (*Funes*); see *People v. Montes* (2014) 58 Cal.4th 809, 859 ["While gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged [citation], 'nothing bars evidence of gang affiliation that is directly relevant to a material issue.' "].) "To prove the existence of a criminal street gang itself, section 186.22, subdivision (f), requires proof of 'a pattern of criminal gang activity.' 'The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses.' [Citation.]" (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.) "[A] 'pattern' is established by the commission of two or more enumerated offenses committed on separate occasions or by two or more persons." (*People v. Williams* (2009) 170 Cal.App.4th 587, 609; see § 186.22, subd. (e); see also *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 ["The statute speaks of a 'pattern' and permits the prosecution to introduce evidence of 'two or more' offenses."].)

Here, the gang evidence was probative to show Christopher's specific intent and motivation for facilitating the shooting (*Franklin*, *supra*, 248 Cal.App.4th at p. 953; *Funes*, *supra*, 23 Cal.App.4th at p. 1518) and therefore "cross-admissible to prove the commission of the attempted murder" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 45). While bifurcation may be warranted where the predicate offenses are "unduly prejudicial" (*Hernandez*, *supra*, 33 Cal.4th at p. 1049), the details of those offered in the instant case—which included unlawful firearm possessions, automobile thefts, active gang participation, and police evasion—were no more inflammatory than the

23.

circumstances surrounding the charged crimes. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 [" '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' "].) Moreover, the court instructed the jury that it (1) "may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged" or "had a motive to commit the crimes charged"; and (2) "may not consider this evidence for any other purpose" such as "conclud[ing] from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (Accord, *Pettie*, *supra*, at pp. 41-42.) "We presume that the jury followed these limiting instructions, and there is nothing in this record to rebut that presumption." (*Franklin*, *supra*, at p. 953; see *Pettie*, *supra*, at p. 45.) Finding no gross unfairness amounting to a denial of due process (*Franklin*, *supra*, at pp. 952-953), we conclude the trial court did not abuse its discretion when it denied the bifurcation motion.

## II.     Assuming arguendo Deputy Geherty expressed an improper opinion, the alleged error was not prejudicial.[*]

a. *Background*

The following exchange occurred on direct examination of Geherty:

> "Q.     . . . [D]oes the fact of what you heard about Mr. Gerardo Alvarado's involvement within the current crime, so the shooting of Antonio . . . , was there anything significant about that involving his membership?
>
> "A.     Can you ask it again?

---

[*] See footnote, *ante*, page 1.

24.

"Q.     Is there anything from what you've heard about Mr. Gerardo Alvarado's involvement in the shooting of Antonio . . . that is significant to you as a gang investigator?

"A.     Absolutely.

"Q.     What?

"A.     So he, from what I've heard, Mr. Gerardo Alvarado arrives and assists Alejandro Alvarado and Chris Velez.  They're acting in association with each other to complete the task of shooting [Antonio].  [¶] . . . [¶]

"Q.     Now going to the facts of the case that we're at.  Is Mr. Alejandro Alvarado, his interaction or his involvement in the shooting of Antonio . . . , is that significant to you for the same reasons you described for Gerardo Alvarado?

"[ALEJANDRO'S ATTORNEY]:  I would object.  Conclusion as to shooting.

"THE COURT:  As to whether the victim was shot?

"[ALEJANDRO'S ATTORNEY]:  Isn't that what we're here – well, the shooting, isn't that what we're here to decide, Your Honor?

"THE COURT:  I'm pretty sure he was shot.

"[ALEJANDRO'S ATTORNEY]:  But it's not that.  It's the intent.

"THE COURT:  As I heard the question, just looking back on it, involvement in the shooting of Antonio . . . , whatever that involvement may be.

"[ALEJANDRO'S ATTORNEY]:  I think it characterizes it as an intentional act.

"THE COURT:  Okay.  He may give his opinion as to what he believes the evidence shows.  There's a specific jury instruction that I'll read to the jury that I read in every case where there's expert testimony.

"Part of that jury instruction has to do with whether you believe or whether you find that the information upon which the expert relied was proven beyond a reasonable doubt.  If you don't find it is, then you treat the opinion accordingly.

25.

"If you do find it is, then it's a different option.  I'll read the actual instruction to you at the end of the case.  That way it's easier for [you to] put it in context with the law and whatever the testimony is that you've heard and will continue to hear.

"The objection is overruled.

"You may continue.

"BY [THE PROSECUTOR]:

"Q.     Is Alejandro Alvarado's involvement that we heard about – based on the evidence that came in through this case, is that significant to you in your determination of whether Mr. Alejandro Alvarado was an active member of Delano Norte on September 10, 2018?

"A.     Absolutely.

"Q.     Is that for the same reasons you described for Gerardo Alvarado?

"A.     That's correct.  [¶] . . . [¶]

"Q.     . . . [Y]ou heard testimony from Antonio . . . that, at the time of the shooting, [Christopher] Velez did not have any Norte[ñ]o-related tattoos.

"Do you remember that?

"A.     I do remember that.

"Q.     Now, two weeks ago, he has quite a few that you're referring to, in your opinion, are Delano Norte criminal street gang tattoos; correct?

"A.     That's correct.

"Q.     Is that significant to you?

"A.     It is.

"Q.     Why?

"A.     It signifies he's earned the right to put those tattoos on his body between the shooting and today.  So he has earned those tattoos, at some point, from this incident to today's date.

"[ALEJANDRO'S ATTORNEY]:  I would object as to 'shooting.' Calls for a conclusion.

"THE COURT:  I understand.  There was a gun.  Something came out of the gun and hit somebody.

"BY [THE PROSECUTOR]:

"Q.    Now, going to significant reports, there is the report regarding the incident that we're here today; correct?

"A.    Yes.

"Q.    You stated already in terms of Alejandro Alvarado and Gerardo, the significance to you, as a gang investigator, does that also apply to [Christopher] Velez?

"A.    It does.  [¶] . . . [¶]

"Q.    When you look at that photo, beginning your testimony of Christopher Velez with his brother, both of them throwing up 21st Street signs – or hand signs two days after the shooting.

"Is that significant to you?

"A.    Yes.

"Q.    Why?

"A.    He's affiliating himself and he's displaying he backs up 21st Street, a subset of Delano Norte criminal street gang two days after the shooting occurred.

"[ALEJANDRO'S ATTORNEY]:  Same objection.

"THE COURT:  Understood.  Overruled.  [¶] . . . [¶]

"Q.    Then we heard testimony, in this case, regarding . . . Guzman's car being the one that dropped off Gerardo Alvarado.

"Do you remember that?

"A.    I do remember that.

"Q.    That car was the same car that Antonio . . . saw following them when they first pulled over the first time, too?

27.

"A.     That's correct.

"Q.     Is that significant to you?

"A.     Yes.

"Q.     Why?

"A.     It's significant because . . . Guzman is an active criminal street gang member for Delano Norte and he – his vehicle is seen at the scene of an attempted homicide or a shooting that involved three other associates and members of Delano Norte.

"[ALEJANDRO'S ATTORNEY]:  Objection.  Conclusion as to attempted homicide.

"THE COURT:  I understand this is the officer's opinion.  There's a specific jury instruction about this issue."

Prior to closing arguments, the court instructed the jury in part:

"[CALCRIM No. 251 (Union of Act and Intent:  Specific Intent or Mental State):]  The acts and other allegations charged in this case require proof of the union or joint operation of act and wrongful intent.

"For you to find a person guilty of the crimes in this case of attempted murder as charged in Count 1, that person must not only intentionally commit the prohibited act, but must do so with a specific intent.  The act and the specific intent required are explained in the instruction for that crime.

"For you to find the allegation of premeditation true as charged in an enhancement to Count 1, that person must not only intentionally commit the prohibited act, but must do so with a specific intent.  The act and the specific intent required are explained in the instruction for each of those enhancements.  [¶] . . . [¶]

"[CALCRIM No. 332 (Expert Witness Testimony):]  Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you're not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information upon which

28.

the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.

"You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion. [¶] . . . [¶]

"[CALCRIM No. 600 (Attempted Murder):] Each of the defendants is charged in Count 1 with attempted murder.

"To prove that the defendant is guilty of attempted murder, the People must prove that:

"One, the defendant took at least one direct, but ineffective step toward killing another person;

"And, two, the defendant intended to kill that person.

"A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.

"A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action.

"A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan did not interrupt the attempt.

"A person who attempts to commit murder is guilty of attempted murder even if, after taking the direct step towards killing, he abandons further efforts to complete the crime or his attempt fails or is interrupted by someone or something beyond his control. On the other hand, if a person freely and voluntarily abandons his plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.

29.

"[CALCRIM No. 601 (Attempted Murder: Deliberation and Premeditation):] If you find the defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation.

"The defendant acted willfully if he intended to kill when he acted.

"The defendant deliberated if he carefully weighed the considerations for or against this choice and, knowing the consequences, decided to kill.

"The defendant acted with premeditation if he decided to kill before completing the acts of attempted murder.

"The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved. [¶] . . . [¶]

"[CALCRIM No. 3404 (Accident):] The defendant is not guilty of any crime if he acted without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of any crime unless you are convinced beyond a reasonable doubt that he acted with the required intent."

b. *Analysis*

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is . . . [¶] . . . [r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] . . . [b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at

30.

or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

On appeal, Christopher contends that "the trial court errored [*sic*] by allowing [Geherty] to testify that each of the defendants harbored the specific intent that [Antonio] be shot, or even killed." Assuming arguendo that Geherty expressed an improper opinion, we find no reasonable probability that a result more favorable to Christopher would have been reached.

"Attempted murder requires the intent to kill and a direct but ineffectual act toward accomplishing the intended killing." (*People v. Juarez* (2016) 62 Cal.4th 1164, 1170.) Attempted murder is aggravated where it is willful, deliberate, and premeditated. (See § 189, subd. (a); *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223.) " '[T]he test on appeal is whether a rational trier of fact could have found premeditation and deliberation beyond a reasonable doubt based upon the evidence presented.' The three categories of evidence for a reviewing court to consider with respect to premeditation and deliberation are: (1) prior planning activity; (2) motive; and (3) the manner of killing.

31.

'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' " (*People v. Villegas*, *supra*, at pp. 1223-1224, fns. omitted.) "Direct evidence of a deliberate and premeditated purpose to kill is not required; the elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference." (*People v. Miller* (1969) 71 Cal.2d 459, 477.)

" '[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 518.) " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-296.) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) " '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]' [Citation.]" (*People v. Pettie*, *supra*, 16 Cal.App.5th at p. 52.) "Aiding and abetting may be shown by circumstantial evidence. It is well settled that the presence at the scene of the crime

32.

and failure to prevent it, companionship and conduct before and after the offense . . . are relevant to determining whether a defendant aided and abetted in the commission of the crime." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 (*Glukhoy*).) "Motive is another circumstance to be considered in determining aiding and abetting liability." (*Ibid.*)

The record shows that on the night of September 9, 2018, Antonio (a 21st Street member) attended a party along with Alejandro (a 21st Street member) and Christopher (a 21st Street associate). At some point, Jose (21st Street's channel and Christopher's brother) and Antonio's then-best friend Guzman (a Delano Norte member) arrived and picked up Alejandro and Christopher. In the wee hours of September 10, 2018, Alejandro and Christopher dropped by Antonio's home and convinced him to give them a ride to Richgrove. Near the beginning of the trip, Alejandro and Christopher had Antonio pull over and the pair left the Accord and pretended to vomit. At the same time, Guzman's sedan passed by. When the trip resumed, Antonio followed Christopher's directions and drove onto a dirt road surrounded by grapevines. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1070 [the defendant orchestrated the victim's presence in the alley where she was murdered], overruled in part by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) In this secluded area, Alejandro and Christopher once again had Antonio pull over, left the Accord, and pretended to vomit. However, while Antonio was preoccupied and sitting in the driver's seat, he was shot from behind by Alejandro, who fired a .22-caliber semiautomatic "hood gun" from a short distance. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [gunshots fired at close range]; *People v. Hawkins* (1995) 10 Cal.4th 920, 956–957 [victim shot "execution-style" in the back of the head and neck], overruled on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 89; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 [total vulnerability of the victim and remote area].) Both Alejandro and Christopher ignored Antonio's plea to go to the hospital. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [impeding victim from

33.

getting medical help]).  After Alejandro's second attempt to fire the gun failed due to a mechanical malfunction, Guzman's sedan—with Gerardo inside—approached with its lights off.  (See *People v. Perez* (1992) 2 Cal.4th 1117, 1126 [evidence of planning shown by surreptitious entry].)  Gerardo exited the vehicle, quarreled with Alejandro, and eventually took the hood gun.  Spotting Antonio, who was trying to retrieve his cell phone from the Accord after emerging from the grapevines, Gerardo tried to fire, but the gun jammed once more.  (See *People v. Juarez*, *supra*, 62 Cal.4th at p. 1170.)  At no point did Christopher intervene to stop either Alejandro or Gerardo from shooting the gun.  (See *Glukhoy*, *supra*, 77 Cal.App.5th at p. 599.)  Antonio fled on foot to Richgrove and contacted the citizen who phoned 911.  Meanwhile, Antonio's vehicle was transported to a distant rural location and burned.  The location data of Alejandro's cell phone provided a timeline of these events.

The record also shows that on May 4, 2018, Officer Rivera arrested Rafael (a Delano Norte member), who was in a stolen vehicle next to Antonio's residence.  After speaking with Rivera, Antonio—the then-channel of 21st Street—provided surveillance camera footage.  Rafael was subsequently convicted of possession of a stolen vehicle.  In or around June 2018, Antonio was removed from his position of authority, which was later taken up by Jose.  On June 20, 2018, a probation search of the residence of Gutierrez Rodriguez revealed a Norteño "incident report" kite signed by Burciaga (a VDL member), which detailed what had transpired on May 4, 2018.  A day or two after the September 10, 2018 shooting, Jose contacted Antonio and accused him of being an informant.  According to the testimonies of Antonio and Geherty, cooperation with law enforcement is prohibited by 21st Street and punishable by death.  (See *Franklin*, *supra*, 248 Cal.App.4th at p. 953 ["[G]ang evidence is 'relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.' "]; *Funes*, *supra*, 23 Cal.App.4th at p. 1518 ["Cases have repeatedly held that it is proper to introduce

34.

evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent."].)

Absent the disputed portions of Geherty's testimony, it is still likely the jury would have convicted Christopher of attempted premeditated murder.[11]

## III. Substantial evidence supported Christopher's conviction for misdemeanor unlawful driving or taking of a vehicle without the owner's consent on count 5.[*]

a. *Standard of review*

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' " (*People v. Tripp*, *supra*, at p. 955, italics omitted.) "This standard of review . . . applies to circumstantial evidence. [Citation.] If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*Ibid*.)

---

[11] Having deemed the purported error harmless, we need not address either the Attorney General's forfeiture claim or Christopher's ineffective-assistance-of-counsel claim, which is premised on a finding of forfeiture.

[*] See footnote, *ante*, page 1.

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond*, *supra*, 71 Cal.2d at p. 755.) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

b. *Analysis*

In general, "[t]o establish a defendant's guilt of violating Vehicle Code section 10851, subdivision (a), the prosecution is required to prove that the defendant drove or took a vehicle belonging to another person, without the owner's consent, and that the defendant had the specific intent to permanently or temporarily deprive the owner of title or possession." (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574, fn. omitted.) One "who is . . . an accomplice in the driving or unauthorized taking or stealing" is also criminally liable. (Veh. Code, § 10851, subd. (a); accord, *People v. Garza* (2005) 35 Cal.4th 866, 875-876.)

As previously stated, " '[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' [Citation.]" (*People v. Maciel*, *supra*, 57 Cal.4th at p. 518.) " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at pp. 295-296.) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed

by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez*, *supra*, 35 Cal.4th at p. 1225.) "Aiding and abetting may be shown by circumstantial evidence. It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense . . . are relevant to determining whether a defendant aided and abetted in the commission of the crime." (*Glukhoy*, *supra*, 77 Cal.App.5th at p. 599.) "Motive is another circumstance to be considered in determining aiding and abetting liability." (*Ibid.*)

As noted, the record demonstrates that Christopher, Alejandro, and Gerardo carried out a scheme to bring Antonio to a secluded area near Richgrove under cover of darkness and kill him. However, the plan went awry and Antonio abandoned his Accord and fled on foot. (See *ante*, at pp. 33-34.) A few hours later, the Accord was found scorched north of Delano. At trial, Antonio testified that he did not give anyone—let alone Christopher, Alejandro, or Gerardo—permission to drive or take his vehicle. The severity of the damage inflicted on the Accord evinced an intent to permanently deprive Antonio of title or possession. Although it is unclear if Christopher himself drove or took the Accord, the evidence sufficiently established that he was—at a minimum—an aider and abettor. Christopher, then a gang associate, was present along with gang members Alejandro and Gerardo when Antonio abandoned the Accord. (Cf. *People v. Clark* (1967) 251 Cal.App.2d 868, 873-874 [the defendant did not know that he was riding in an illegally acquired car until the police pursued it].) Given the remoteness of this site, the time of day, and the relatively prompt relocation of the Accord, a trier of fact could reasonably infer that Christopher, Alejandro, and Gerardo were responsible for the vehicle's asportation. Given that these men had worked together to kill Antonio, albeit unsuccessfully, one could rationally surmise that they once again joined forces to

accomplish a much less grisly task.  Therefore, we conclude substantial evidence supported Christopher's conviction on count 5.

**IV.    Even if we assume arguendo that section 1109 is retroactive, reversal is unwarranted.**[*]

Section 1109, subdivision (a) provides:

> "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:  [¶]  (1) The question of the defendant's guilt of the underlying offense shall be first determined.  [¶]  (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement.  Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence."

Christopher makes two contentions.  First, section 1109 applies retroactively and the case must be "remanded for a bifurcated trial on all charges and enhancements." (Italics omitted.)  Second, if a showing of prejudice is required, he "would have had a more favorable result had the trial been bifurcated . . . ."

"The question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal."  (*People v. Tran* (2022) 13 Cal.5th 1169, 1208.)  We need not address the issue here because we conclude Christopher "cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated."  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480, citing *Watson*, *supra*, 46 Cal.2d at p. 836; see *People v. Tran*, *supra*, 13 Cal.5th at pp. 1208-1210 [*Watson* standard].)  As previously discussed, the gang evidence was more

---

[*] See footnote, *ante*, page 1.

probative than prejudicial and cross-admissible to prove the commission of the attempted murder and the court issued a limiting instruction.  (See *ante*, at pp. 20-24.)**12**

## V.     The Attorney General concedes numerous issues.*

a.  *Section 186.22*

Amended subdivision (g) of section 186.22 now reads:

"[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Christopher makes two contentions.  First, the amended section 186.22 applies retroactively.  Second, his "gang related convictions and enhancements must be reversed" (boldface & capitalization omitted) and retried.  The Attorney General concedes these points.  We accept this concession.

b.  *Instructional error*

Christopher argues that the trial court failed to instruct the jury on the elements of carrying a loaded firearm in public as an active participant in a criminal street gang.  (See *People v. Bush* (2017) 7 Cal.App.5th 457, 483 ["[A] 'trial court must instruct the jury on all elements of the charged offenses.' "].)  The Attorney General concedes the matter.**13** We accept this concession.

---

**12** We had deferred Christopher's request for judicial notice of certain legislative history pending consideration of this appeal on its merits.  In light of our disposition, we deny the request.

* See footnote, *ante*, page 1.

**13** Given the Attorney General's concession, we need not address Christopher's ineffective-assistance-of-counsel claim, which is premised on a finding of forfeiture.

39.

c. *Necessarily included offense rule*

Christopher asserts that "a violation of section 186.22, subdivision (a) . . . is a necessarily lesser included offense of . . . [a violation of] section 25850, subdivision (c)(3)" and his "conviction on count 3 for a violation of section 186.22, subdivision (a), must be reversed because a defendant may not be convicted of both the greater and the necessarily lesser offenses." (See *People v. Ortega* (1998) 19 Cal.4th 686, 692 [" '[M]ultiple convictions may *not* be based on necessarily included offenses.' "]; *People v. Flores* (2005) 129 Cal.App.4th 174, 184 [the defendant had been convicted of both active gang participation and carrying a firearm while he was an active gang participant; the appellate court reversed the former].) The Attorney General concedes the matter. We accept this concession.

d. *Unauthorized sentence*

Christopher argues the trial court improperly imposed 15 years to life pursuant to section 186.22, subdivision (b)(5) and 10 years pursuant to section 12022.53, subdivision (e)(2) on count 1. (See *People v. Brookfield* (2009) 47 Cal.4th 583, 590 ["A defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53. In contrast, when another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a criminal street gang . . . in addition to an enhancement imposed pursuant to' section 12022.53."].) The Attorney General concedes the matter. We accept the concession.

## VI. *Bruen* does not foreclose a retrial on the charge of carrying a loaded firearm in public as an active participant in a criminal street gang.

In a supplemental brief, Christopher contends that he cannot be retried on the charge of carrying a loaded firearm in public as an active gang participant (§ 25850, subd. (c)(3)) because the United States Supreme Court's recent holding in *Bruen* "renders

40.

California's general gun carrying licensing statutes (§§ 26150, 26155) unconstitutional as they contain the same fatal flaws as New York's licensing statute." (Fns. omitted.) We disagree.

a. *Pertinent state statutes*

In California, "[a] person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." (§ 25850, subd. (a).) "Carrying a loaded firearm in violation of this section is punishable, as follows: [¶] . . . [¶] . . . Where the person is an active participant in a criminal street gang, . . . as a felony." (*Id.*, subd. (c)(3).) "Section 25850 does not apply to the carrying of any handgun by any person as authorized pursuant to Chapter 4 (commencing with Section 26150) of Division 5." (§ 26010.)

Section 26150, subdivision (a) states:

"When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following:

"(1) The applicant is of good moral character.

"(2) Good cause exists for issuance of the license.

"(3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business.

"(4) The applicant has completed a course of training as described in Section 26165.[14]"

---

**14** For "new license applicants," an "acceptable" course must "be no less than eight hours, but shall not be required to exceed 16 hours in length"; "include instruction on firearm safety, firearm handling, shooting technique, and laws regarding the permissible use of a firearm"; and "include live-fire shooting exercises on a firing range"

41.

Section 26155, subdivision (a) similarly provides:

> "When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the chief or other head of a municipal police department of any city or city and county may issue a license to that person upon proof of all of the following:
>
> "(1) The applicant is of good moral character.
>
> "(2) Good cause exists for issuance of the license.
>
> "(3) The applicant is a resident of that city.
>
> "(4) The applicant has completed a course of training as described in Section 26165."

Before a license is issued, "[t]he fingerprints of each applicant shall be taken . . . ." (§ 26185, subd. (a)(1).) A license "shall not be issued if the Department of Justice determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm." (§ 26195, subd. (a).) A license "shall be revoked by the local licensing authority if at any time either the local licensing authority is notified by the Department of Justice that a licensee is prohibited by state or federal law from owning or purchasing firearms, or the local licensing authority determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm." (*Id.*, subd. (b)(1).)

b. *The* Bruen *decision*

*Bruen* concerned New York's licensing scheme. (See *Bruen*, *supra*, 142 S.Ct. at pp. 2122-2124.) Under that scheme, an applicant who wants to possess a firearm at home or his or her place of business "must convince a 'licensing officer'—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that 'no good cause exists for the denial of the

---

and "a demonstration by the applicant of safe handling of, and shooting proficiency with, each firearm that the applicant is applying to be licensed to carry." (§ 26165, subd. (a).)

license.' [Citation.]" (*Id.* at pp. 2122-2123.) To secure an unrestricted license to carry a firearm outside the home or place of business, an applicant pre-*Bruen* needed to prove that " 'proper cause' " existed. (*Id.* at p. 2123.) The phrase "proper cause" was construed by the state courts to require the applicant to " 'demonstrate a special need for self-protection distinguishable from that of the general community.' [Citation.]" (*Ibid.*) This was generally established by "evidence 'of particular threats, attacks or other extraordinary danger to personal safety.' [Citations.]" (*Ibid.*)

The petitioners—law-abiding residents of New York—applied for unrestricted licenses to carry handguns in public for general self-defense. However, their requests were denied for failure to satisfy the "proper cause" requirement. (*Bruen*, *supra*, 142 S.Ct. at pp. 2124-2125.) The petitioners sued for declaratory and injunctive relief, alleging that the respondents—state officials in charge of the processing of licensing applications and the enforcement of licensing laws—"violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications on the basis that they had failed to show 'proper cause,' i.e., had failed to demonstrate a unique need for self-defense." (*Id.* at p. 2125, italics omitted.) The federal district court dismissed the complaint and the Second Circuit Court of Appeals affirmed. (*Ibid.*)

The United States Supreme Court reversed the Second Circuit's judgment, concluding that "the State's licensing regime violates the Constitution" "[b]ecause the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense." (*Bruen*, *supra*, 142 S.Ct. at p. 2122.) The high court applied the following "text-and-history standard" (*id.* at p. 2138):

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' [Citation.]" (*Bruen*, *supra*, 142 S.Ct. at pp. 2129-2130.)

Since (1) "[t]he Second Amendment's plain text . . . presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense" (*id*. at p. 2135) and (2) "the historical record . . . does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" or "any . . . tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense" (*id*. at p. 2138, fn. omitted), "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" (*id*. at p. 2156).

The United States Supreme Court pointed out that six states—New York, California, Hawaii, Maryland, Massachusetts, and New Jersey—and the District of Columbia "have 'may issue' licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." (*Bruen*, *supra*, 142 S.Ct. at pp. 2123-2124.) "Aside from New York, . . . only California, the District of Columbia, Hawaii, Maryland, Massachusetts, and New Jersey have analogues to [New York's] 'proper cause' standard."[15] (*Bruen*, at p. 2124, fn. omitted.) By contrast, 43 states "are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (*Id*. at p. 2123, fn. omitted.) In a footnote, the high court stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.]" (*Id*. at p. 2138, fn. 9.) It emphasized that those schemes—"which often require applicants to

---

[15] The high court identified section 26150's " '[g]ood cause' " condition. (*Bruen*, *supra*, 142 S.Ct. at p. 2124, fn. 2.)

44.

undergo a background check or pass a firearms safety course"—"do not require applicants to show an atypical need for armed self-defense"; "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens' "; and "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials . . . rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion' " "that typify proper-cause standards like New York's." (*Ibid.*)

    c. *Applying* Bruen

    In view of *Bruen*, subdivision (a)(2) of sections 26150 and 26155, which conditions issuance of a license on—among other things—a showing of "[g]ood cause" and was deemed by the United States Supreme Court to be equivalent to New York's invalid "proper cause" standard, is clearly unconstitutional. However, Christopher goes even further and argues that "[t]he 'may issue' language renders [California's] *entire* licensing scheme unconstitutional on its face because the licensing authority has discretion to deny a public carry license even if all the criteria have been met." (See *ante*, at pp. 41-42.) The majority opinion in *Bruen* made no mention of—let alone rely upon—the presence of "may issue" or language to that effect in the challenged New York statute. In fact, no such wording was used. (See N.Y. Penal Law former § 400.00(2) (2021) ["A license for a pistol or revolver, other than an assault weapon or a disguised gun, *shall be issued* to . . . (f) have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof . . . ." (italics added)].) Notably, at least two of the "shall issue" licensing regimes identified by the high court utilize the permissive "may" in their statutes. (See, e.g., Conn. Gen. Stat. § 29-28(b) (2021); Del. Code, tit. 11, § 1441 (2022).) Finally, while the high court stated in a footnote that its holding should not be construed to render unconstitutional the "shall issue" licensing schemes, nowhere does it indicate that its

45.

holding should be construed to invalidate "may issue" licensing schemes in their entirety.[16]

Christopher also argues that *Bruen* invalidated "good moral character" conditions because they entail " 'appraisal of facts, the exercise of judgment, and the formation of an opinion . . . .' " Once again, the majority opinion in *Bruen* made no such pronouncement. At most, the opinion related in passing that "good moral character" is one of three prerequisites for a license to possess a firearm at one's home or place of business. (See *Bruen*, *supra*, 142 S.Ct. at pp. 2122-2123.) Notably, at least two of the "shall issue" licensing regimes identified by the high court impose an explicit "good moral character" requirement. (See, e.g., Ga. Code Ann. § 16-11-129(d)(4) (Supp. 2021); Me. Rev. Stat. Ann., tit. 25, § 2003 (Cum. Supp. 2021).)

To reiterate, *Bruen* only struck down one specific provision of New York's gun licensing scheme that impermissibly burdened law-abiding citizens' Second Amendment rights by mandating proof of a special need beyond general self-defense. We decline to expand *Bruen*'s scope to the degree Christopher urges.

d. *Severability*

" 'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.' [Citation.] Because '[t]he unconstitutionality of a part of an [a]ct does not necessarily defeat or affect the validity of its remaining provisions,' [citation], the 'normal rule' is 'that partial, rather than facial, invalidation is the required course,' [citation]." (*Free Enterprise Fund v. Public Company Accounting Oversight Bd.* (2010) 561 U.S. 477, 508.) "In determining whether the invalid portions of a statute can be severed, we look first to any severability clause. The presence of such a clause

---

[16] Christopher often cites Justice Kavanaugh's concurring opinion. However, statements in a concurrence do not constitute binding precedent. (*Maryland v. Wilson* (1997) 519 U.S. 408, 412-413.)

establishes a presumption in favor of severance.  [Citation.]  We will, however, consider three additional criteria:  '[T]he invalid provision must be grammatically, functionally, and volitionally separable.'  [Citation.]"  (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270-271; see *Leavitt v. Jane L.* (1996) 518 U.S. 137, 139 ["Severability is of course a matter of state law."].)

"To be grammatically separable, the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words."  (*Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1358.)  "To be functionally separable, the remainder after separation of the invalid part must be ' " 'complete in itself' " ' and 'capable of independent application.'  [Citation.]"  (*Ibid.*)  "The issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part . . . .  Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid."  (*California Redevelopment Assn. v. Matosantos*, *supra*, 53 Cal.4th at p. 273.)

Here, while there is no severability clause, the criteria for severability are otherwise satisfied.  The invalid "good cause" condition in subdivision (a)(2) of sections 26150 and 26155 is grammatically detached from the other requirements for licensure.  (See *ante*, at pp. 41-42.)  Both sections 26150 and 26155 are complete in themselves and capable of independent application without subdivision (a)(2).  As for volitional separability, we believe the Legislature would prefer a licensing scheme minus the "good cause" condition to nothing at all.  As discussed, section 25850 criminalizes carrying a loaded firearm in public, but this provision does not apply to licensed possession.  (§ 26010; see *ante*, at p. 41.)  Other exemptions from section 25850 only cover particular individuals and/or deal with distinct circumstances.[17]  Thus, excising the entire licensing

---

[17] Specifically, these exemptions are for peace officers (§ 25900); military personnel (§ 26000); persons using target ranges to practice shooting (§ 26005,

scheme would render section 26010 nugatory and—in *further* contravention of *Bruen*—"impair[] the right of the general population to peaceable public carry." (*Bruen*, *supra*, 142 S.Ct. at p. 2145.) We doubt the Legislature would embrace this absurdity. Having concluded the "good cause" condition is severable, California's licensing scheme remains valid post-*Bruen*.

e. *Standing*

Moreover, " ' "[o]ne who seeks to raise a constitutional question must show that his rights are affected injuriously by the law which he attacks and that he is actually aggrieved by its operation." [Citation.]' [Citation.]" (*People v. Conley* (2004) 116 Cal.App.4th 566, 576; see *People v. Perry* (1931) 212 Cal. 186, 193 ["It is well-settled law that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of a real and vital controversy between the litigants in the particular case before it. It is incumbent upon a party to an action or proceeding who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby."].) Here, unlike the petitioners in *Bruen*, the record does not

---

subd. (a)); members of shooting clubs hunting on club property (*id.*, subd. (b)); armored vehicle guards (§ 26015); retired federal officers (§ 26020); certain persons who have completed a regular course in firearms training approved by the Commission on Peace Officer Standards and Training, i.e., patrol special police officers, animal control officers or zookeepers, humane officers, and harbor police officers (§ 26025); certain persons issued a certificate of completion of courses in the carrying and use of firearms and the exercise of powers of arrest by the Department of Consumer Affairs, i.e., guards, private investigators, private patrol operators, and alarm company operators (§ 26030); persons carrying a loaded firearm at his or her place of business or private property (§ 26035); lawful hunting (§ 26040); persons carrying a loaded firearm who reasonably believe that "any person or the property of any person is in immediate, grave danger" and "the carrying of the weapon is necessary for the preservation of that person or property" (§ 26045, subd. (a)); persons under threat from the subject of a restraining order (*id.*, subd. (b)); persons making lawful arrests (§ 26050); persons carrying a loaded firearm at his or her place of residence (§ 26055); and persons storing rockets, rocket propelled projectile launchers, or the like aboard a vessel or aircraft (§ 26060).

show, nor does Christopher claim, that he applied for and was denied a license to possess the gun in question.[18] (See *U.S. v. Decastro* (2d Cir. 2012) 682 F.3d 160, 164 [" 'As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy.' "].)  Thus, he lacks standing to challenge the constitutionality of California's licensing scheme.[19]

## VII.   There was no cumulative error.[*]

Finally, Christopher contends the cumulative effect of multiple trial errors requires reversal of the judgment.  "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  "A claim of cumulative error is in essence a due process claim . . . ."  (*People v. Rivas*, *supra*, 214 Cal.App.4th at p. 1436.)  " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' "  (*Ibid.*)  "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.' "  (*People v. Williams*, *supra*, 170 Cal.App.4th at p. 646.)  Having reviewed and analyzed each

---

**18** The record does show that Christopher was 19 years of age at the time of the September 10, 2018 shooting.  Accordingly, he would have been unable to acquire a gun lawfully.  (See §§ 27505, subd. (a) ["No person, corporation, or firm shall sell, loan, or transfer a firearm to a minor, nor sell a handgun to an individual under 21 years of age."]; 27510, subd. (a) ["A person licensed under Sections 26700 to 26915, inclusive, shall not sell, supply, deliver, or give possession or control of a firearm to any person who is under 21 years of age."].)

**19** Christopher cites *Shuttlesworth v. Birmingham* (1969) 394 U.S. 147—a First Amendment case—for the proposition that "it is irrelevant that the record is devoid of any effort by [him] to obtain a license to carry a firearm."  (Boldface & some capitalization omitted.)  That case is inapposite as it involved an ordinance that was unconstitutional on its face.  (See *Shuttlesworth v. Birmingham*, at pp. 150-151.)

**\*** See footnote, *ante*, page 1.

purported error, we cannot conclude that the cumulative effect was such that Christopher was deprived of due process and a fair trial.  Therefore, we reject his argument.

## **DISPOSITION**

The convictions on counts 2 and 3 and the gang and vicarious firearm use enhancements on count 1 are reversed.[20]  The matter is remanded back to the trial court to give the People an opportunity to retry these substantive charges and allegations. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 481.)  Following retrial, or if the People elect not to retry, the trial court shall resentence Christopher.  In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DE SANTOS, J.

---

[20] A violation of section 186.22, subdivision (b), is a prerequisite for vicarious liability under section 12022.53, subdivision (e)(1).  (See § 12022.53, subd. (e)(1)(A).)